FILED

2008 Jun-13  AM 09:25
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH R. HALL, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 2:07-CV-0847-LSC |
| | ] | |
| MICHAEL J. ASTRUE, | ] | |
| Commissioner, | ] | |
| Social Security Administration, | ] | |
| | ] | |
| Defendant. | ] | |

MEMORANDUM OF OPINION

I.    Introduction.

Joseph R. Hall ("Plaintiff"), appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Mr. Hall timely pursued and exhausted his administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Mr. Hall was fifty-seven years old at the time of the Administrative

Law Judge's ("ALJ's") decision, and he has a limited education.[1]  (Tr. at 19.)

His past work experiences include employment as a barbecue pit cook,

packer, landscape laborer, welder, truck driver, carpenter's helper, forklift

operator, and inspector.  *Id.*  Mr. Hall claims that he became disabled on

January 1, 2002, due to effects of a gunshot wound, a colostomy, and a

urostomy.  *Id.* at 51.  At the administrative hearing, Plaintiff also alleged

disability due to bipolar disorder and depression.  *Id.* at 473, 477.

When evaluating the disability of individuals over the age of eighteen,

the regulations prescribe a five-step sequential evaluation process.  *See* 20

C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001).  The first step requires a determination of whether the

claimant is "doing substantial gainful activity."   20 C.F.R. §§

404.1520(a)(4)(i), 416.920(a)(4)(i).  If he or she is, the claimant is not

disabled and the evaluation stops.  *Id.*  If he or she is not, the Commissioner

next considers the effect of all of the physical and mental impairments

combined.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   These

_____

[1]Plaintiff testified that he quit school in the eleventh grade.  He took a GED test
while he was in the army, but he did not pass the test.  (Tr. at 461.)

impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id.* The decision depends on the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. pt. 404, subpt. P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, he or she will be found disabled without further consideration. *Id.* If they do not, a determination on the claimant's residual functional capacity ("RFC") will be made and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do his or her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the

analysis proceeds to the fifth step.  *Id.*  Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience in order to determine if he or she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can do other work, the claimant is not disabled.  *Id.*

Applying the sequential evaluation process, the ALJ found that Mr. Hall meets the nondisability requirements for a period of disability and DIB, and is insured through December 31, 2002.  (Tr. at 20.)  He further determined that Mr. Hall has not engaged in substantial gainful activity since the alleged onset of his disability.  *Id.*  According to the ALJ, Plaintiff's depression, bipolar disorder, colostomy (reversed), and urostomy secondary to a gunshot wound in 1998, are impairments which are considered "severe" based on the requirements set forth in the regulations.  *Id.*  However, he found that these impairments neither met nor medically equaled any of the listed impairments set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ did not find Mr. Hall's allegations to be totally credible, and he determined that Plaintiff "retained the residual functional capacity to perform the exertional demands of light work which allowed a sit/stand

option; no unprotected heights; and occasional pushing or pulling using the upper or lower extremities." *Id*.

According to the ALJ, Mr. Hall is unable to perform any of his past relevant work, he is an "individual closely approaching advanced age," and he has a "limited education" as those terms are defined by the regulations. *Id*. at 21.  The ALJ determined that Plaintiff "has not acquired skills that will transfer to other jobs within the residual functional capacity set out above."  *Id*.  Even though Plaintiff cannot perform the full range of light work, the ALJ used Medical-Vocation Rule 202.10 and 202.11 as a guideline for finding that there are a significant number of jobs in the national economy that he is capable of performing.  *Id*.  These jobs include: vending attendant (unskilled light), with 700 jobs regionally and 200,000 jobs nationally; packager (unskilled, light), with 1,300 jobs regionally and 470,000 jobs nationally; and mail clerk (unskilled light), with 1,400 jobs regionally and 200,000 jobs nationally.  *Id*.  The ALJ concluded his findings by stating that Plaintiff "is not disabled within the meaning of the Social Security Act."  *Id*.

II.    Standard of Review.

The Court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales,* 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions.  *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.*  "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'"  *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Indeed, even if this Court finds that the evidence preponderates against the Commissioner's

decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

III.    Discussion.

Mr. Hall alleges that the ALJ's decision should be reversed and remanded for three reasons. First, Plaintiff believes that the ALJ's physical RFC finding is not based on substantial evidence. (Doc. 7.) Second, Plaintiff argues that the ALJ's RFC findings failed to adequately consider obesity. *Id*. Finally, Plaintiff contends that the ALJ's mental RFC is against the greater weight of the evidence. *Id*. Specifically, Plaintiff submits the ALJ failed to consider certain evidence that demonstrates that Plaintiff's mental limitations are greater than "mild to moderate." *Id*.

A.    Hall's Physical Residual Functional Capacity.

Plaintiff argues that the ALJ's finding that he retains the RFC to perform the exertional demands of light work is not supported by substantial evidence. A RFC is defined as "the most you can still do despite your limitations," and the ALJ will assess an individual's RFC based on "all the relevant evidence in your case record." 20 C.F.R. § 404.1545 (a). The Grid Guidelines define light "work as work which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 404.1567(b). Even though the weight lifted may be very little, a job is in the light category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. *Id.*

The Commissioner considers the following factors in deciding the weight to be given to any medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other factors which tend to support or contradict the opinion. *See* 20 C.F.R. § 416.927 (d). Generally, a treating source's opinion is given more weight since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's medical

impairments.   *See* 20 C.F.R. § 416.927(d)(2).

In determining that Plaintiff retains the RFC to perform light work, the ALJ explained that he carefully considered Plaintiff's subjective allegations of pain as well as the medical evidence and medical opinions contained in the record.   (Tr. at 16-17.)   It is clear from the record that the ALJ considered Plaintiff's claims that:

> he was shot in a domestic dispute in 1998, which left him with a temporary colostomy and permanent catheter.  He stated that he has to monitor the catheter so that it will not overflow.  He told me that when the bag is full, he must empty it, and that he experiences pain upon irrigation of the bag.  He testified that the catheter becomes infected easily.  The claimant testified that he is unable to pick up anything more than 3 to 4 pounds, although he can lift a gallon of milk.  He stated that he has no trouble walking, but can not sit too long because of placing pressure on his bag.  The claimant stated that he still has some bullet fragments inside his body which cannot be removed.  The claimant testified that his need to go to the bathroom varies, and sometimes a cup of coffee will fill the bag up.  He told him that doctors told him to drink cranberry juice and water all the time.  He testified that he takes Tylenol for any pain which he has, but that he does not hurt all the time.  He testifies that he is taking medication for hypothyrodism and that he gets light headaches once or twice a month.  The claimant testified that he has a left sided hernia. . . .  Mr. Hall testified that he drives daily to his daughter's and girlfriend [sic] homes, and sometimes goes to the farm, where he walks around a lake.  He indicated that he can walk "ok" and it stimulates flow through his bag, but that he is unable to walk longer than 7 to 10 minutes before

stopping.  He testified that he is able to sit for approximately 45 minutes.  Mr. Hall states that he watches television . . . and alternates between a standing and reclined position.  He testified that he lays down 1 hour in the afternoon.

*Id.* at 14.

In rejecting Plaintiff's testimony, the ALJ expressly found the Plaintiff's subjective allegations not to be credible "in light of the medical history, the reports of treating and examining practitioners, and the clinical findings made on examination."  *Id.* at 17.  The ALJ explained:

Mr. Hall has received his primary care treatment from the [Veterans Administration Medical Center] for his catheter placement occurring from his gunshot wound in 1998.  While he has reported some problems with drainage and infection, the evidence shows that these conditions were only temporary and failed to impose genuine, debilitating symptoms.  For instance, when seen in March 2002, Mr. Hall reported a draining and infection problem, however, when he returned the next month, he had no complaints, and a review of his systems was unremarkable.  Moreover, the claimant rated his pain as zero out of ten.  This is not a disabling level of pain.  Additional progress notes throughout the pertinent period demonstrate similar reports by Mr. Hall, where he was asymptomatic, had no complaints, stated that he felt fine and classified his pain level as zero.

*Id.* at 17-18.

The ALJ also stated that:

> [t]he claimant has been considered to be neurologically intact
> with normal strength and sensation.   His extremities have
> demonstrated full range of motion with no cyanosis, clubbing or
> edema.  No examining or treating physician has mentioned any
> work restrictions on account of his catheter during the relevant
> period.  Consequently, the claimant's assertion of disabling pain
> . . . is not credible and disproportionate to the objective
> medical evidence.

*Id.*

The ALJ's analysis is supported by objective medical evidence.   In
February 2002, soon after his alleged onset date, Plaintiff reported a small
amount of blood returned to his catheter and his medical source instructed
him to drink extra fluids to flush out the bladder.  *Id.* at 157.  In March 2002,
he had a urinary infection, however, by April the infection cleared and
Plaintiff had no complaints and he reported "0" pain.  *Id.* at 152, 153, 154.
In April 2002, Plaintiff reported a drainage problem, but his urine was clear.
*Id.* at 146.  In September 2002, his catheter was removed and reinserted
without any complications.  *Id.* at 141.  In October 2002, the catheter was
clean and dry and Plaintiff reported he felt fine, rating his pain as "0."  *Id.*
at 138, 140.   In November 2002, Plaintiff was asymptomatic, and in
December 2002, he denied urinary tract infection symptoms.  *Id.* at 134,

135.  On January 24, 2003, Plaintiff returned for a routine catheter change and reported no recent problems.  *Id.*  On March 7, 2003, he had no complaints when he returned for a catheter change, and an April 2003 follow-up note shows that Plaintiff reported his urine was doing fine, without foul odor or cloudiness.  *Id.* at 126, 133.  At the April 2003 follow-up, Plaintiff also denied any nausea, vomiting, diarrhea, pain or other symptoms.  *Id.* at 126.  In November 2003, Plaintiff still rated his pain as "0," and his extremities had full range of motion as they had before.  *Id.* at 422-23.

Treatment is a factor an ALJ may consider in assessing a claimant's complaints.  *See* Social Security Ruling (SSR) 97-7p, 61 Fed. Reg. 34483, 34487 (1996).  It is clear that Plaintiff's course of treatment does not reflect a disabling condition as a result of his gunshot wounds.  This Court finds that the reasons the ALJ articulated for rejecting the Plaintiff's claims were explicit and adequate and substantial evidence supports the ALJ's determination that the Plaintiff can perform light work.

B.     ALJ's Consideration of Plaintiff's Obesity.

Plaintiff also contends that the ALJ's RFC findings are not supported

by substantial evidence because he failed to adequately consider Plaintiff's obesity.  The Eleventh Circuit has made clear on several occasions that statements and findings by an ALJ can show that a Plaintiff's impairments have been considered in combination.  *See Wilson*, 284 F.3d at 1224 (the ALJ specifically stated that "the medical evidence establishes that [Wilson] had [several injuries] which constitute a severe impairment, but that he did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4."); *see also Jones v. Dept. of Health and Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991).

"Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence to support his claim."  *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); 42 U.S.C. § 423(d)(5) ("[a]n individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require").  Moreover, it is Plaintiff's burden to provide a medical record that is

complete, and if he fails to do so, the ALJ will make a decision based on the evidence of record.  *See* 20 C.F.R. § 404.1513(e); 20 C.F.R. § 404.1516.

In this case, Plaintiff has made no showing that his obesity would prohibit him from performing the exertional demands of light work.  While various treatment notes describe Plaintiff as obese (Tr. at 154, 171, 185-86), no medical source assessed limitations beyond those the ALJ found in determining Plaintiff's RFC.  In fact, Plaintiff admitted that his Body Mass Index ("BMI") does not place him in the "obese" category.  *See* Doc. 7 at 9. Several doctors noted that Plaintiff has good range of motion in his extremities with no edema.  (Tr. at 126, 166, 172).  Additionally, Plaintiff reported that he had "0" pain on multiple occasions.  *Id*. at 126, 138, 152, 162, 170).  Plaintiff also testified that he is able to do household chores, walk, shop, attend church, drive, and walk around the lake.

The record reveals that the ALJ adequately considered Plaintiff's obesity.  Substantial evidence supports the ALJ's determination that Plaintiff is capable of performing the exertional demands of light work.

C.    Hall's Mental Residual Functional Capacity.

Finally, Plaintiff asserts the ALJ's mental RFC is against the greater

weight of the evidence.  In this argument, Plaintiff alleges that the ALJ failed to consider his multiple psychiatric hospitalizations from 1999 to 2002 when determining Plaintiff's RFC.

When determining a claimant's mental RFC, the ALJ "must first assess the nature and extent of [the claimant's] mental limitations and restrictions and then determine [his or her] residual functional capacity for work on a regular and continuing basis."  20 C.F.R. § 404.1545(c).  This assessment must be "based on all the relevant evidence in [the] record."  20 C.F.R. § 1545(a)(1).  In particular, the ALJ "will consider any statements about what [the claimant] can still do that have been provided by medical sources."  20 C.F.R. § 1545(a)(4).

"The ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence[.]"  *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990).  In *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981), the Eleventh Circuit held that the ALJ erred because his decision did not make clear the weight accorded to the various testimony that he considered.  The Eleventh Circuit stated that:

> The decision states only that the ALJ has carefully considered all
> of the testimony . . . and exhibits . . . and has given weight to
> each as he feels should be properly accorded to it.   This
> statement tells us nothing whatsoever [sic] it goes without
> saying that the ALJ gave the testimony the weight he believed
> should be accorded to it.  What is required is that the ALJ state
> specifically the weight accorded to each item of evidence and
> why he reached that decision.   In the absence of such a
> statement, it is impossible for a reviewing court to determine
> whether the ultimate decision on the merits of the claim is
> rational and supported by substantial evidence.   Unless the
> Secretary has analyzed all evidence and has sufficiently
> explained the weight he has given to obviously probative
> exhibits, to say that his decision is supported by substantial
> evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the
> conclusions reached are rational.

*Id.* (internal quotation marks and citations omitted).

The record reflects that at the time Plaintiff was shot in 1998, his

family advised the hospital that he had been treated with Lithium for

"questionable psychiatric problems."   (Tr. at 95.)  Upon consulting with

Psychiatry, Plaintiff was continued on Haldol and Ativan.  *Id.*

Plaintiff was also psychiatrically hospitalized from September 3, 1999,

until September 8, 1999.  *Id.* at 250.  The record indicates that Plaintiff was

brought to the emergency room by police after making threats to kill

himself.  *Id.*  Before going into custody, he told the police to "go ahead and

shoot him dead." *Id*.  The hospital reported that Plaintiff claimed that he

heard the lords voice telling him to pull out his colostomy tube and to kill

himself.  *Id*.  Upon discharge, the hospital emphasized that "patient is to

follow up with the mental health clinic within 30 days of discharge." *Id*. at

251.  Plaintiff's Global Assessment of Functioning ("GAF") score was 20 upon

being admitted, and reached 40 by discharge.[2]  *Id*. at 249.  His discharge

diagnosis was "[m]ajor depression, recurrent, severe." *Id*.

Plaintiff was psychiatrically hospitalized again from December 3, 1999,

until December 13, 1999.  *Id*. at 246-47.  Nursing notes reveal that "patient

becomes irritated and angers easily." *Id*. at 328.  Psychiatry notes indicate

---

[2]The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale.  The GAF scale ranges from 0 to 100 with a lower score indicating greater level of social and occupational impairment.  A GAF of 20 is indicative of some danger towards others, including suicide attempts without clear expectation of death or serious symptoms including suicidal ideation or gross impairment in speech.  A GAF score of 31-40 describes "some impairment in reality testing or communication" or "major impairment in several areas, such as work, or school, family relations, judgment, thinking, or mood." A GAF score of 41-50 indicates "serious symptoms" and includes "impairment in social, occupational or school functioning." A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. A GAF score of 61-70 reflects mild symptoms, with some difficulty in social and occupational functioning. A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning.  *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV, 32-34 (4th ed., American Psychiatric Assoc. 2000).

that Plaintiff "appeared restless and poorly groomed . . . . He "still has

trouble controlling his temper around the nurses [and] . . . is still somewhat

religiously preoccupied. *Id*. at 331. On December 5, Plaintiff was diagnosed

with major depression with psychotic features and assessed a GAF score of

30.

On December 1, 2000, Plaintiff was hospitalized on court petition by

his daughter for "bizarre and agitated behavior." *Id*. at 399. He was

diagnosed with manic bipolar disorder with psychotic features and assigned

a GAF score of 30. *Id*. at 401.

Finally, on June 20, 2002, Plaintiff was hospitalized and diagnosed with

a longstanding history of bipolar disorder. *Id*. at 388. The hospital stated

that, "[t]he pattern is that he goes off his medication, becomes delusional,

religiously preoccupied . . . [a]t some point . . . becoming more harmful to

himself." *Id*. They also noted that Plaintiff told his daughter that the CIA

had planted bombs in the dumpsters outside his house. *Id*. During this

hospitalization, he was assigned a GAF score of 30. *Id*.

On June 11, 2003, Dr. Champena stated in a mental health note that

Plaintiff carries a history of bipolar disorder since 1998. Dr. Champena

assumed that his medication had kept the illness under control and in

remission based on his understanding that Plaintiff had "no psychiatric

hospitalizations."  *Id*. at 122.

In his decision, the ALJ explained:

As far as depression is concerned, treating records confirm that
throughout the pertinent period, his bipolar disorder has been
adequately controlled by medication, and that he has
experienced no side effects from the [medication] used to
control his symptoms.  The claimant admitted that his Lithium
has helped his symptoms, and that he only visits the mental
health practitioners at the [Veteran's Administration Medical
Center] on an as needed basis.  His mood has also been noted as
stable on his medication, and his mental status examination in
November 2003 has been considered unremarkable.  *The
objective, medical evidence establishes that prior to December
31, 2002, the claimant experienced no greater than mild to
moderate restrictions of daily living, difficulties in maintaining
social functioning, and difficulties in maintaining concentration,
persistence, or pace on account of any mental impairment . . .
.*  Moreover, the claimant's admitted activities of daily living,
which includes taking care of his personal needs, visiting with
friends and family, performing household chores, shopping and
attending church services, serve to undermine his assertions of
disability in this case . . . .  Prior to December 31, 2002, the
claimant's  pain and depression were reasonably expected to
result in no greater than mild to moderate functional limitations
on his ability to engage in basic work activities.

*Id*. at 18 (emphasis added).

In reaching his conclusions regarding Plaintiff's mental RFC, the ALJ did

not explicitly discount any of the GAF scores assessed from Plaintiff's numerous hospitalizations.   It appears instead, that the ALJ relied exclusively on the medical opinion of Dr. Champena, who stated that Plaintiff's bipolar disorder is adequately controlled by medication.   While this medical opinion may be supported by other factors, including Plaintiff's testimony at the hearing and his activities of daily living, it appears to be completely contradicted by the numerous medical reports from Plaintiff's hospitalizations.   In addition, the ALJ offers no explanation for rejecting the diagnoses and conclusions of the various hospital reports.   In the absence of such an explanation **by the ALJ**, it is impossible for this Court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.   *See Cowart*, 662 F.2d at 735.

On remand, the ALJ shall, at a minimum, state the weight accorded to all medical opinions, particularly those dealing with Plaintiff's psychiatric hospitalizations, and the reasons for determining such.

IV.    Conclusion.

Upon review of the administrative record, and considering all of Mr. Hall's arguments, the Court finds that the ALJ's decision is not supported by

substantial evidence.  For the foregoing reasons, the ALJ's denial of benefits is **vacated**, and the case is **remanded** to the ALJ for further proceedings consistent with this opinion.   A corresponding order will be entered contemporaneously with this Memorandum of Opinion.

Done this 13th day of June 2008.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671